**ROCKPORT COMPANY, d/b/a Frye Boots, Appellant,**

v.

**WEDGEWOOD, INC., Appellee.**

No. 88–1455.

Supreme Court of Iowa.

Oct. 18, 1989.

Theodore F. Sporer of Watson & Peterson, P.C., Des Moines, for appellant.

Michael F. Mumma and Rita Harmening Pedersen of Mumma & Pedersen, Jefferson, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, NEUMAN and SNELL, JJ.

McGIVERIN, Chief Justice.

The Rockport Company sued Wedgewood, Inc., because of Wedgewood's failure to pay for shoes and other goods which Rockport sold and delivered to Wedgewood. Rockport's collection suit was aided by a prejudgment order for attachment under which some of Wedgewood's inventory was seized. Wedgewood's eventual counterclaims included a claim for wrongful attachment which is the subject of this appeal. The trial court entered judgment for Rockport on the debt and then ruled that Rockport had wrongfully attached Wedgewood's inventory. On the counterclaim, the court assessed actual and punitive damages against Rockport. Rockport appeals the court's judgment on the wrongful attachment counterclaim. We affirm and remand for fixing of attorney fees for Wedgewood.

I. *Background facts and proceedings.* The trial court's findings of fact are not disputed by either party.

The court found that at various times prior to the filing of this lawsuit, Wedgewood purchased a shoe inventory from Rockport on account. When Rockport filed its petition on August 5, 1987, Wedgewood owed Rockport $10,924.30. The debt was unsecured.

In May 1987, Wedgewood began receiving demand letters from Rockport's counsel regarding this debt. At about the same time, Wedgewood began negotiations to sell its assets to David Ewan. A final sale agreement was reached on July 24. On that day, Wedgewood's counsel sent out notices of the proposed bulk transfer to Ewan of all of Wedgewood's inventory, furniture, fixtures and equipment. Notice was given to all of Wedgewood's creditors, including Rockport, whose notice was mailed to its business address in Marlboro, Massachusetts. The notice apprised Wedgewood's creditors that the bulk transfer was to take place at 11:00 a.m. on August 6.

Rockport received the notice of bulk transfer on July 29. There is no claim that the notice did not conform to the requirements of Iowa's bulk transfer law. *See* Iowa Code §§ 554.6101—554.6111 (1987) (Iowa version of Uniform Commercial Code—Bulk Transfers). The notice stated that the estimated total of Wedgewood's debts was $427,005.58. The notice also stated that the total consideration to be received for the bulk transfer was $133,-000; that First Interstate Bank of Urbandale had a security interest in Wedgewood's "collateral" and was to be paid

$118,000 from the proceeds of the transfer; and that the remaining $15,000 was to be paid to Merle Hay Mall of Des Moines, which had a landlord's lien on Wedgewood's property. The notice further stated that Wedgewood's debts would not, as a result of the transfer, be paid in full as they fell due. The court found that there was no suggestion of fraud in this transaction.

Rockport filed this collection suit on August 5, and obtained a prejudgment order for attachment of Wedgewood's property on the same day. Rockport's counsel did not perform a "U.C.C. search" to confirm that First Interstate Bank did, indeed, have a security interest in the assets being transferred. *See* Iowa Code § 554.9407. The ground alleged for the attachment was that contained in Iowa Code section 639.-3(10) (1987):

> That the defendant is about to convert the defendant's property or a part thereof into money for the purpose of placing it beyond the reach of the defendant's creditors.

At approximately 10:00 a.m. on August 6, a Polk County deputy sheriff, executing the writ of attachment, seized 452 pairs of shoes from Wedgewood's store at Merle Hay Mall. The shoes were returned the next day.

The parties agree that the seizure of Wedgewood's inventory pursuant to the prejudgment order for attachment prevented the August 6 closing of the bulk transfer between Wedgewood and Ewan. The transfer finally was consummated on August 10, but Wedgewood received $36,000 less than it was to receive under the original agreement. The reduction in the sales price of the business was attributed to damage to Wedgewood's trade name which occurred from the seizure of its inventory. The trial court found that the use of Wedgewood's trade name had been included in the original agreement between Wedgewood and Ewan.

Wedgewood timely filed its answer to Rockport's petition. The answer included counterclaims for wrongful attachment, abuse of process, and tortious interference with a contractual relationship, and sought actual and punitive damages from Rockport.

This law action proceeded to trial before the court. The court entered judgment for Rockport on its petition for the debt and then entered judgment for Wedgewood on its wrongful attachment counterclaim, assessing $36,000 actual damages plus reasonable attorney fees against Rockport. The court also awarded Wedgewood $1,000 exemplary damages, finding that Rockport's actions were taken in reckless disregard of Wedgewood's rights. The court did not address Wedgewood's counterclaims for abuse of process and tortious interference with a contractual relationship.

Rockport appeals from the court's judgment on the wrongful attachment counterclaim.[1]

II. *Wrongful attachment and the trial court's order.* An attachment may be said to have been sued out wrongfully where the grounds upon which the plaintiff predicates its right to the attachment are false. The burden of proof is on the counterclaiming defendant to show that the alleged grounds for attachment are not true and that the plaintiff had no reasonable grounds to believe otherwise. *Moore v. Altmyer*, 199 Iowa 368, 373, 202 N.W. 214, 216 (1925); Iowa Code §§ 639.14 and 639.15.

In Iowa, the recognized grounds for attachment are specified by statute. Iowa Code section 639.3(10) provides that one ground for attachment is "[t]hat the defendant is about to convert the defendant's property or a part thereof into money for the purpose of placing it beyond the reach of the defendant's creditors." In this case, Rockport obtained a prejudgment order for attachment on this ground after learning that Wedgewood intended to convert its

---

1. Rockport does not contest the amount of actual and punitive damages awarded by the trial court on the wrongful attachment counterclaim; the sole issue on appeal is whether the attachment was wrongful.

assets into money through a bulk transfer under Iowa Code sections 554.6101—554.6111, and to pay its secured creditors from the proceeds in preference over Rockport, an unsecured creditor. Essentially, Wedgewood announced its intention to prefer its secured creditors over its unsecured creditors after the liquidation of its business assets.

■ Rockport first contends that the trial court erroneously engrafted a "fraudulent intent" requirement onto section 639.3(10). Because there is no suggestion of fraudulent intent in this case, the argument goes, the court necessarily concluded that the attachment obtained pursuant to section 639.3(10) was wrongful, based upon its erroneous interpretation of that statute.

Rockport further contends that but for the error in engrafting a "fraudulent intent" requirement onto section 639.3(10), the court would have found that its attachment of Wedgewood's inventory was justified, because Wedgewood clearly was converting its assets into money and admitted to intending to place the money beyond the reach of Rockport by paying its secured creditors. Thus, Rockport argues that the requirements of section 639.3(10) were satisfied in this case, so that its attachment was not wrongful and the trial court erred in finding otherwise.

Rockport's first contention is not supported by the record. The trial court did not engraft a fraudulent intent requirement onto section 639.3(10). In its ruling, the court wrote:

> [T]he purpose of the bulk transfer was to liquidate Defendant's business assets to pay its secured creditors, not to place the assets beyond the reach of its creditors. This is apparent from the Notice of Bulk Transfer that Plaintiff received. The alleged ground for attachment is not true. Nor did the Plaintiff have a reasonable ground to believe otherwise. The mere bulk transfer of a business does not warrant an attachment unless the transfer was made with fraudulent intent.... No evidence of fraudulent intent appears in the record. The Court concludes

Plaintiff's Writ of Attachment was sued out wrongfully.

The first sentence of the quoted passage shows that the court's conclusion was based on the fact that Wedgewood did not intend to place the money beyond the reach of its creditors, but was going to pay its secured creditors. The last part of the quoted passage simply explains why the court concluded that Rockport had no reasonable grounds to believe that its attachment was justified—that is, because there was no evidence of fraud. Rockport had no reason to believe that Wedgewood was not going to carry out its announced intention to pay other creditors. If fraud was, in fact, reasonably suspected, then a bulk transfer notice would warrant attachment to prevent consummation of the transfer under Iowa Code section 639.3(5). *See* Iowa Code § 639.3(5) (attachment available where "the defendant is about to dispose of the defendant's property with intent to defraud the defendant's creditors"). We conclude that the trial court did not erroneously engraft a fraudulent intent requirement onto section 639.3(10).

■ III. *Wrongful attachment, preferential transfers and Iowa Code section 639.3(10).* The question remaining is whether the fact that Wedgewood announced its intention to convert its assets into money through a bulk transfer and then prefer its secured creditors over Rockport is justification for suing out an attachment under section 639.3(10).

Rockport points out that section 639.3(10) does not require that a party against whom an attachment is sought place the property or proceeds beyond the reach of "all" of its creditors. What Rockport ignores, however, is that neither does section 639.3(10) state that an attachment is available where the party against whom it is sought is placing the property or proceeds beyond the reach of "some" of its creditors, or beyond the reach of "the creditor who is seeking the attachment." Rockport's "argument from omission" does not advance its position in this case, because the implication of the omission could cut either way. The statute simply does not address the

situation we are faced with, *i.e.*, where the party against whom the attachment is sought is placing the property or proceeds beyond the reach of some creditors by paying other bona fide creditors.

Rockport contends that its position is supported by language in *Klooster v. North Iowa State Bank*, 404 N.W.2d 564 (Iowa 1987). In that case, the bank obtained an ex parte order for attachment of the Kloosters' swine herd, which was collateral for debts the Kloosters owed the bank. *Id.* at 566. The ground alleged for attachment was that set forth in section 639.3(10). *Id.* After the bank sold the swine herd without the Kloosters' knowledge, Kloosters sued the bank on numerous theories, including wrongful attachment. *Id.* The evidence tended to show that Kloosters had been selling parts of their swine herd, in which the bank held a security interest, without turning the proceeds over to the bank. *Id.* at 568. The jury returned substantial verdicts against the bank on all counts. *Id.* at 566. On appeal, we reversed and held that the bank's motion for a directed verdict on the wrongful attachment claim should have been granted. *Id.* at 568.

Rockport seizes upon language in *Klooster* that states:

If [an unsecured creditor] has reasonable grounds to believe that a debtor is placing assets beyond the creditor's reach, enough of the debtor's assets to satisfy the creditor's claim may be placed in *custodia legis* pending trial of the action on the unsecured account.

*Id.* As Rockport points out, this language speaks in the singular. Nothing in the quoted passage implies that the debtor need be placing the assets beyond the reach of all of its creditors. In addition, some of the court's language suggests that the reversal of the *Klooster* wrongful attachment judgment could have been based upon section 639.3(10) as an alternative holding ("We need not, however, turn our decision *entirely* on the reasonableness of the bank's belief [that the Kloosters were putting assets beyond the reach of their creditors]."). *Id.* (emphasis added).

Nevertheless, the language relied upon by Rockport is clearly dicta. Our holding on the issue of wrongful attachment was stated later in the opinion, where we said:

We agree that under this set of circumstances the bank was entitled to possession of the hogs either by self-help, *where permissible under section 554.-9503*, or by appropriate legal process *as authorized in section 554.9501(1)*. Because the Kloosters' wrongful attachment claim is based upon actions of the bank in wrongfully dispossessing them of the hogs, it is lacking in legal merit. The bank was legally entitled to take possession of the hogs either personally or by employing legal process to place the collateral in *custodia legis*.

*Id.* (emphasis added). Thus, we held that the bank, as a secured creditor, was entitled to seize the hogs under chapter 554, *regardless of whether it was reasonable in its belief under section 639.3(10) or entitled to an attachment under chapter 639*. Chapter 554 clearly provides that a secured creditor may take possession of its collateral merely upon the debtor's default whether by judgment, foreclosure, other judicial procedure or self-help. *See* Iowa Code §§ 554.9501 and 554.9503 (1987).

In addition, *Klooster* is distinguishable from the present case on its facts. Unlike this case, *Klooster* did not involve a debtor reducing its property to money with the announced and uncontroverted intention of paying its secured creditors over its unsecured creditors; rather, *Klooster* involved a debtor refusing to pay a secured creditor from the proceeds of that creditor's collateral. In addition, the bank in *Klooster*, a secured creditor, was attaching its own collateral—collateral it had the right to take possession of immediately upon mere default. In the present case, Rockport is an unsecured creditor that attached collateral it knew, or should have known, belonged to Wedgewood's secured creditors.

As noted before, section 639.3(10) is silent as to whether it authorizes an attachment when the party against whom the attachment is sought is placing property or proceeds beyond the reach of "all" of its creditors, "some" of its creditors, or "the creditor who is seeking the attachment."

The statute is ambiguous, and this case turns on its construction.

The substance of the transaction which Rockport objected to in this case is that of a proposed non-fraudulent preferential transfer outside of bankruptcy. We believe that section 639.3(10) should·not be construed to authorize an attachment under these circumstances.

Allowing an attachment here would conflict with the well-established principle that outside of bankruptcy and in the absence of fraud, even an insolvent debtor may prefer one creditor over another. *See, e.g., Andrew v. Nabholz*, 219 Iowa 75, 76, 257 N.W. 587, 588 (1934). We are not inclined to adopt a construction of section 639.3(10) that would allow a disappointed unsecured creditor to attach its debtor's assets merely because the debtor was paying another bona fide creditor.

The fact that this preferential transfer involved a bulk sale does not change the general rule allowing a debtor to prefer one creditor over another. The general assembly rejected that option when it rejected section 6–106 of the Uniform Commercial Code's bulk transfer law. *See* U.C.C. § 6–106 (1962); *cf.* Iowa Code § 554.6106 (1987) (reserved section indicating that Iowa omitted, and still has not adopted, section 6–106 of the Official Text of the 1962 Uniform Commercial Code, otherwise enacted into Iowa law by 1965 Iowa Acts ch. 413). Section 6–106 would have imposed a duty on bulk transferees to ensure that the proceeds of the bulk transfer were applied to pay the transferor's debts. U.C.C. § 6–106(1) (1962). Significant for our purpose here is the fact that the rejected section also would have provided that: "If the consideration payable [for the bulk transfer] is not enough to pay all of the said debts [of the transferor] in full distribution shall be made pro rata." U.C.C. § 6–106(3) (1962). Thus, the legislature must have contemplated that a bulk transfer might not satisfy all of a transferor-debtor's creditors; yet the legislature chose not to step in and require that all creditors be treated equally in such a case.

Furthermore, it would be particularly incongruous with other Iowa law to hold that an attachment was justified by the threatened preferential transfer in this case, given the fact that the assets seized were fully encumbered in favor of creditors other than Rockport. Under Iowa law, a security interest in collateral continues in the proceeds of the collateral. Iowa Code § 554.9306. Moreover, an unsecured creditor who attaches a debtor's personal property which is security for another debt must pay the secured creditor the amount of the secured debt or post security therefor within ten days of the levy. *See* Iowa Code §§ 626.34 and 639.40. Simply stated, where there is no suggestion of fraud, an unsecured creditor who attaches a secured creditor's collateral to delay its sale for the benefit of the secured creditor gains nothing; the only effect of the attachment is to inconvenience the other parties involved.

The result urged by Rockport would also appear to conflict with the intent of the bulk transfer law. Were we to hold that a mere bulk transfer notice constitutes grounds for attachment under section 639.-3(10), then bulk transfers of even fully encumbered property would be subject to the interference of unsecured creditors. Yet Iowa's bulk transfer law exempts from its provisions transfers in settlement or realization of a lien or security interest. Iowa Code § 554.6103(3) (1987). Thus, it appears that Wedgewood might have lawfully effected this entire transaction without giving any notice of the intended bulk transfer whatsoever. *See Ouachita Elec. Coop. Corp. v. Evans–St. Clair*, 12 Ark. App. 171, 672 S.W.2d 660 (1984) (transfer of encumbered assets to party other than the secured party held within U.C.C. § 6–103(3) where result of transaction was to settle security interest and no harm was done to position of any unsecured creditor); *Techsonic Indus., Inc. v. Barney's Bassin' Shop, Inc.*, 621 S.W.2d 332 (Mo.Ct.App. 1981) (U.C.C. § 6–103(3) does not require that the transfer in settlement of a security interest be made to the secured party); *but see Starman v. John Wolfe, Inc.*, 490 S.W.2d 377 (Mo.Ct.App.1973) (to be exempt from Article 6 under U.C.C. § 6–103(3), transfer should be made to holder of security interest and not to a transferee for the benefit of the security interest holder); *see*

also *Stone's Pharmacy, Inc. v. Pharmacy Accounting Management, Inc.*, 812 F.2d 1063 (8th Cir.1987) (recognizing split of authority).

We conclude that the fact that a debtor announces its intention to convert its assets to money through a bulk transfer and then prefer its secured creditors over its unsecured creditors in distribution of the money is not justification for suing out an attachment under Iowa Code section 639.3(10). The language in *Klooster* implying the contrary is not controlling. In the case of ordinary preferential transfers, the debtor is not placing its assets beyond the reach of its creditors; it is simply preferring some creditors over others. Outside of bankruptcy and in the absence of fraud, our law allows this. The trial court was correct in so holding.

The judgment of the trial court is affirmed. Because Rockport's appeal was taken before the trial court had determined the amount of its award to Wedgewood for reasonable attorney fees incurred there, we remand for that determination.

AFFIRMED AND REMANDED.